**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| SNOWCAST SOLUTIONS LLC d/b/a NOBEL WEATHER ASSOCIATES, | | Hon. Manish S. Shah |
| | : | Magistrate Sidney I. Schenkier |
| Plaintiff, | : | Civil No. 1:15-cv-05305 |
| - vs. - | : | |
| ENDURANCE SPECIALTY HOLDINGS LTD. | : | |
| | : | |
| Defendant. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**BRIEF IN SUPPORT OF MOTION TO DISMISS**
**BY DEFENDANT ENDURANCE SPECIALTY HOLDINGS LTD.**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF FACTS .......................................................................... 2

       A.    The Asserted Patents .................................................................... 2

       B.    SnowCast's Claims Against Endurance ........................................ 4

             1.    Patent Infringement ............................................................ 4

             2.    Deceptive And Unfair Trade Practices ............................... 4

III.   LEGAL STANDARD ................................................................................. 5

       A.    Patent Eligibility Under 35 U.S.C. § 101 Is Appropriately Decided On A
             Rule 12(b)(6) Motion To Dismiss ................................................. 5

       B.    The Supreme Court's *Alice* Decision Sets Forth A Two-Step Test For
             Patent Eligibility .......................................................................... 6

IV.    SNOWCAST'S CLAIMS AGAINST ENDURANCE MUST BE DISMISSED ............... 8

       A.    The Asserted Patents Are Invalid For Claiming Patent Ineligible Subject
             Matter Under The Two-Step *Alice* Test ...................................... 8

             1.    The Asserted Patent Claims Fail Step 1 Of The *Alice* Test Because
                   They Are Directed To An Abstract Idea ............................. 8

             2.    The Asserted Patent Claims Fail Step 2 Of The *Alice* Test Because
                   They Do Not Recite An Inventive Concept ....................... 12

             3.    The Machine-Or-Transformation Test Confirms That The Asserted
                   Patents Are Unpatentable .................................................. 18

             4.    The Dependent Claims Of The Asserted Patents Are Equally
                   Unpatentable ..................................................................... 20

       B.    Deceptive Trade Practices .......................................................... 22

i

1.  Endurance Has Not Represented Sponsorship Or Affiliation With
    SnowCast Under UDTPA Section 2(a)(5) ................................................ 23

2.  Endurance's Acts Have Not Created A Likelihood Of Confusion
    Or Misunderstanding Under UDTPA Section 2(a)(12) ........................... 24

3.  Injunctive Relief Is The Only Remedy Available Under The
    UDTPA ................................................................................................. 25

V.  CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013)................................................................................10

*Alice Corp. Pty. Ltd. v. CLS Bank International*,
    134 S. Ct. 2347 (2014)..............................................................................*Passim*

*American Kitchen Delights, Inc. v. John Soules Foods, Inc.*,
    No. 14 CV 646, 2014 WL 4897506 (N.D. Ill. Sept. 29, 2014)........................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................5

*Bancorp Services, LLC v. Sun Life Assurance Co. of Canada*,
    687 F.3d 1266 (Fed. Cir. 2012).......................................................................16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................5

*Bilski v. Kappos*,
    561 U.S. 593 (2010)..............................................................................*Passim*

*In re Bilski*,
    545 F.3d 943 (Fed. Cir. 2008) (Rader, J., dissenting), *aff'd sub nom. Bilski v.*
    *Kappos*, 561 U.S. 593 (2010)...................................................................19, 20

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350, 1352 (Fed. Cir. 2014)..............................................................5, 7, 8

*Card Verification Solutions, LLC v. Citigroup, Inc.*,
    No. 13 C 6339, 2014 WL 4922524 (N.D. Ill. Sep. 29, 2014)...........................................14

*Celsis In Vitro, Inc. v. CellsDirect, Inc.*,
    83 F. Supp. 3d 774 (N.D. Ill. 2015) ................................................................7

*Chamberlain Group, Inc. v. Linear LLC*,
    No. 14-cv-05197, 2015 WL 4111456 (N.D. Ill. July 7, 2015) .........................................12

*Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*,
    384 Ill. App. 3d 849 (Ill. App. Ct. 2008) ......................................................24, 25

*Connell v. KLN Steel Products Ltd.*,
No 04 C, 194, 2009 WL 691292 (N.D. Ill. Mar. 16, 2009) *dismissed by* 449 F.
App'x 14 (Fed. Cir. 2010) ................................................................................23

*Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)..................................................................7, 10

*DDR Holdings, LLC v Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014).......................................................................18

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012).......................................................................19

*Diamond v. Diehr*,
450 U.S. 175 (1981)...........................................................................................7

*Digitech Image Techs, LLC v. Electronics for Imaging, Inc.*,
758 F.3d 1344 (Fed. Cir. 2014); .......................................................................7

*Fedders Corp. v. Elite Classics*,
268 F. Supp. 2d 1051 (N.D. Ill. 2003) .............................................................22

*Intellectual Ventures I, LLC v. Capital One Bank (U.S.A.), Nat'l Ass'n*,
792 F.3d 1363 (Fed. Cir. 2015).................................................................*Passim*

*Internet Patents Corp. v. Active Network, Inc.*,
790 F.3d 1343, 1344 (Fed. Cir. 2015)..........................................................7, 16

*Market Track, LLC v. Efficient Collaborative Retail Marketing, LLC*,
No. 14 C 4957, 2015 WL 3637740 (N.D. Ill. June 11, 2015) *appeal filed* (Fed.
Cir. Aug. 6, 2015) (No. 15-1906) ...............................................................*Passim*

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
132 S. Ct. 1289 (2012)............................................................................1, 6, 13

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015)...............................................5, 7, 10, 11, 16

*Phillips v. Cox*,
261 Ill. App. 3d 78 (Ill. App. Ct. 1994) ....................................................24, 25

*Russian Media Group, LLC v. Cable America Inc.*,
No. 06 C 3578, 2008 WL 360692 (N.D. Ill. Feb. 7, 2005)...............................23

*Smart Systems Innovations, LLC v. Chicago Transit Authority*,
No. 14 C 08053, 2015 WL 4184486 (N.D. Ill. July 10, 2015) ..................................*Passim*

*Trading Technologies International, Inc. v. CQG Inc.*,
2015 WL 774655 (N.D. Ill Feb. 24, 2015) .......................................................................12

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709(Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015) ........................*Passim*

*Versata Development Group, Inc. v. SAP America, Inc.*,
793 F.3d 1306 ........................................................................................................*Passim*

## STATUTES

35 U.S.C. § 101 .........................................................................................................*Passim*

35 U.S.C. § 271 ...................................................................................................................1

815 Ill. Comp. Stat. Ann. 510/1 to 510/7 (West 2008) ......................................................1

815 Ill. Comp. Stat. Ann. 510/2(a)(5) (West 2008) ...............................................4, 22, 23

815 Ill. Comp. Stat. Ann. 510/2(a)(12) (West 2008) .......................................4, 22, 24, 25

## RULES

Rule 12(b)(6) of the Federal Rules of Civil Procedure ...............................................1, 2

## OTHER AUTHORITIES

U.S. Patent No. 8,543,427 (filed Nov. 2, 2009) (the "'427 Patent") .....................*Passim*

U.S. Patent No. 8,924,242 (filed Sept. 18, 2013) (the "'232 Patent") ...................*Passim*

U.S. Patent Application 08/833,892 (filed Apr. 10, 1997) .........................................10

## I.     PRELIMINARY STATEMENT

Plaintiff SnowCast Solutions LLC ("SnowCast") filed a Complaint in this Court on June 6, 2015, against Defendant Endurance Specialty Holdings Ltd. ("Endurance").  The Complaint alleges three causes of action: two for alleged patent infringement pursuant to 35 U.S.C. § 271, and a third for alleged violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/1 to 510/7 (West 2008)  ("UDTPA").  Endurance now moves to dismiss the entire Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  As to the allegations of patent infringement, Endurance moves on the grounds that the asserted patents are invalid because they claim ineligible subject matter under 35 U.S.C. § 101 and the Supreme Court decision in *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014) ("*Alice*"), and subsequent cases applying the *Alice* decision.  As to the allegation of a violation of the UDTPA, Endurance moves on the grounds that SnowCast's claim is based solely on Endurance's sales of its own products, which cannot be supported under the law.

*Alice* and its progeny provide clear guidance on the boundaries of patent eligible subject matter.  Indeed, the Supreme Court clarified the difference between eligible subject matter and ineligible abstract ideas in *Bilski v. Kappos*, 561 U.S. 593 (2010), *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012), and *Alice*, among others.  Under those standards, all claims of SnowCast's two asserted patents fall well outside of the bounds of 35 U.S.C. § 101, since they are directed to nothing more than the fundamental abstract idea of using a computer to carry out traditional methods of pricing (i.e., calculating the price of) weather derivatives.  It is black letter law that these abstract ideas are ineligible for patent protection.

SnowCast's UDTPA claim is improperly based solely on Endurance's sale of its products to customers, on the theory that such customers may somehow come to believe they are dealing

with SnowCast.  Essentially, SnowCast is asking the Court to find that the mere act of selling a product that is later the subject of a claim of patent infringement gives rise to liability under the UDTPA.  Such a finding would not only run contrary to law, but would have a chilling effect on innovation and commerce.  Absent an allegation that Endurance's actions were likely to mislead, or any factual allegations to support such an inference, SnowCast's UDTPA claim must fail.

Endurance therefore respectfully moves this Court for an order dismissing all of SnowCast's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    STATEMENT OF FACTS

### A.    The Asserted Patents

SnowCast has asserted two business method patents against Endurance: U.S. Patent No. 8,543,427 (filed Nov. 2, 2009) (the "'427 Patent"), and its continuation-in-part U.S. Patent No. 8,924,242 (filed Sept. 18, 2013) (the "'242 Patent") (together "the asserted patents")  D.I. 1-1, 1-2. The '427 Patent issued on September 24, 2013, and the '242 Patent issued on December 30, 2014. The patents share nearly identical specifications.[1]

The asserted patents disclose methods for pricing weather derivatives using information accessed from various sources.  The patents acknowledge that, prior to their filing, "[t]he use of weather derivatives [was] known" and "weather derivatives [could] be purchased by traders." '427 Patent col. 4 ll. 19-26.  The purportedly novel aspect of the patents is simply automatically performing these "complex and difficult" calculations for "users of services in the weather industry" who may otherwise find weather derivatives "too complex."  *Id*. col. 4 ll. 21-25.

---

[1] For simplicity, this brief generally cites only to the specification of the '427 Patent.  However, all cited portions are also available in the '242 Patent (at slightly different line numbers).

Each of the asserted patents has only a single independent claim.  They are substantively equivalent and share most limitations:

| '427 Patent Claim 1 | '242 Patent Claim 1 |
|---|---|
| A computer-implemented method for the risk management and cost containment of weather-related services, the method comprising: | A computer-implemented method implemented on a platform for the risk management and cost containment of weather-related services, the method comprising: |
| connecting a weather risk management system implemented as a software into a memory of a computer to a computer network, the weather risk management system including a unitary event module for calculating at least a cost at a site in an area, a global module for calculating at least a base price for services at a plurality of sites from the unitary event module, and a hedge assignment module for calculating a tick price and an associated premium for the selection of an option for managing the risk and containing the cost of weather-related services, and wherein the computer network is in data communication with a weather database and a weather option database; and | connecting a weather risk management system implemented into a computer in data communication to a computer network for the transfer of input information from a weather database and a weather option database to the weather risk management system, wherein the weather risk management system includes a unitary event module for calculating at least a cost at a site in an area, a global module for calculating at least a base price for services at one or more of a plurality of sites taken from the unitary event module, and a hedge assignment module for calculating a tick price and an associated premium for the selection of an option for managing the risk and containing the cost of weather-related services; |
| entering into the weather risk management system at an interface a first site sizing data, wherein the unitary event module uploads from the weather database a yearly estimate for the first site and the hedge assignment module uploads from the weather option database a strike price, and the associated premium for the option at a calculated tick size.<br>'427 Patent col. 12 ll. 6-28. | entering into the weather risk management system input information from the weather database and the weather option database; |
| | calculating by the unitary event module from the entered input information the cost at the site in the area; |
| | calculating the base price for services in one or more of the plurality of sites from the unitary event module; and |
| | calculating the tick price and the associated premium for the selection of the option for managing the risk and containing the cost by the hedge assignment module.<br>'242 Patent col. 12 ll. 2-28. |

The claims only recite a series of highly generalized steps: "entering" information regarding the locations in question, using the foregoing information to "calculat[e]" pricing information for weather derivatives, and "connecting" computer hardware to perform the foregoing steps.

In addition to each patent's independent claim, the '427 Patent has three dependent claims and the '242 Patent has 15 dependent claims. These dependent claims describe further options that can be applied to the derivative pricing method, such as setting the amount of coverage ('427 Patent, claim 4) or performing calculations using spreadsheet software ('242 Patent, claim 13).

**B.      SnowCast's Claims Against Endurance**

SnowCast's Complaint asserts three claims: two for patent infringement, and a third unconventional claim for deceptive and unfair trade practices based on the alleged infringement.

**1.      Patent Infringement**

SnowCast claims that at least eleven of Endurance's weather risk management products infringe its '427 and '242 Patents. D.I. 1 ¶¶ 13, 24. The Complaint does not identify any details of the alleged infringement with specificity, but simply claims that "[u]pon information and belief, to offer these different products and services, methods are performed which contain, embody and employ the invention(s) claimed in the [] patent[s]." *Id.* ¶¶ 14, 25.

**2.      Deceptive And Unfair Trade Practices**

SnowCast alleges Endurance violated Sections 2(a)(5) and 2(a)(12) of the UDTPA, which proscribe, respectively, representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have", 815 Ill. Comp. Stat. Ann. 510/2(a)(5) (West 2008), and engaging "in any other conduct which similarly creates a likelihood of confusion or misunderstanding, 815 Ill. Comp. Stat. Ann. 510/2(a)(12) (West 2008). The sole basis upon which  SnowCast relies to support its claim is Endurance's "advertis[ing], offer[ing], generat[ing] and sell[ing] contracts" for its own products. D.I. 1 ¶ 35. SnowCast proffers that Endurance's clients "believe[] [such contracts] to be legal and not to infringe any third-party rights," and therefore, if these customers are aware of SnowCast's patents,

they "may be misled" into thinking Endurance has taken a license to SnowCast technology or does not infringe SnowCasts's patents. *Id*. SnowCast does not allege that Endurance made any statements or claims regarding SnowCast's patented technology or products, nor does SnowCast point to any particular customers who were allegedly misled. Instead, SnowCast's UDTPA claim is premised exclusively on the theory that because Endurance sold products that are now being accused of infringing SnowCast's patents, Endurance violated the UDTPA.

## III.    LEGAL STANDARD

### A.    Patent Eligibility Under 35 U.S.C. § 101 Is Appropriately Decided On A Rule 12(b)(6) Motion To Dismiss

In light of the Supreme Court's instruction that patent eligibility is a "threshold" issue, *Bilski*, 561 U.S. at 602, the Federal Circuit has repeatedly confirmed that disposing of patent-ineligible claims on the pleadings is permissible. *See, e.g.*, *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014). Review of patent eligibility at the motion to dismiss stage complies with the Supreme Court's guidance that, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, '"this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court."'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (ellipsis in original; citations omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."). "Addressing 35 U.S.C. § 101 at the outset not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by the owners of vague and overbroad business method patents." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1364 (Fed. Cir. 2015) (Mayer, J., concurring).

**B.      The Supreme Court's *Alice* Decision Sets Forth A Two-Step Test For Patent Eligibility**

Section 101 of the Patent Act defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  However, the Supreme Court has found an implicit exception to Section 101 for abstract ideas, which are unpatentable under Section 101.  *E.g.*, *Alice,* 134 S. Ct. at 2354.  Last year, the Supreme Court decided *Alice Corp. Pty. Ltd. v. CLS Bank International*, 134 S. Ct. 2347 (2014), clarifying and endorsing a two-step test (previously established in *Mayo*) for identifying unpatentable abstract ideas.[2]  *See Alice*, 134 S. Ct. at 2355.  Step 1 requires a determination of whether the claims at issue are directed to (inter alia) an abstract idea.  *Id.*; *see also Mayo*, 132 S. Ct. at 1293-94.  "The 'abstract ideas' category embodies 'the longstanding rule that "[a]n idea of itself is not patentable."'"  *Alice*, 134 S. Ct. at 2355 (alteration in original) (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)).

Next, if the court finds that the claims are indeed directed to an abstract idea, Step 2 directs courts to assess whether the patent claims include "an '"inventive concept"'" that can "'transform' the . . . abstract idea into a patent-eligible invention."  *Alice*, 134 S. Ct. at 2357 (citation omitted).  The Court defined this inventive concept as "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'"  *Id.* at 2355 (alteration in original) (citation omitted); *see also Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1332 (Fed. Cir. 2015)

---

[2] Though the '242 Patent technically issued on December 30, 2014—after the June 19, 2014 *Alice* decision—the underlying patent application received its Notice of Allowability on March 31, 2014, prior to the *Alice* decision.  Thus *Alice* was not taken into account during the examiner's review of either patent.

at *23. For example, in *Diamond v. Diehr*, 450 U.S. 175 (1981), the Supreme Court found the use of a mathematical formula in a computer-implemented process for curing synthetic rubber to be patent eligible because the process further included an unconventional series of technological steps: "installing rubber in a press, closing the mold, continuously measuring the temperature inside the mold, [and] feeding the measured temperature information to a computer to recalculate an updated cure time and automatically opening the press at the proper time." *Celsis In Vitro, Inc. v. CellsDirect, Inc.*, 83 F. Supp. 3d 774, 783 (N.D. Ill. 2015) (citing *Diamond*, 450 U.S. at 187). Thus, the patentee sought "'only to foreclose from others the use of that equation *in conjunction with all of the other steps in their claimed process*.'" *Id.* at 783 (emphasis added) (citation omitted) (quoting *Mayo*, 132 S. Ct. at 1299).

In the wake of *Alice*, the Federal Circuit and many district courts have endorsed its broad application. Indeed, over the last year, the Federal Circuit has affirmed numerous invalidity findings under 35 U.S.C. § 101.[3] Likewise, the Northern District of Illinois has applied *Alice* to find a number of patents invalid for claiming patent-ineligible abstract ideas. *See, e.g.*, *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, No. 14 C 4957, 2015 WL 3637740, at *5-14 (N.D. Ill. June 11, 2015) (identifying, organizing, and presenting stored information), *appeal filed* (Fed. Cir. Aug. 6, 2015) (No. 15-1906); *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, No. 14 C 08053, 2015 WL 4184486, at *3-7 (N.D. Ill. July 10, 2015) (public transit payment via credit card).

---

[3] *E.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1344 (Fed. Cir. 2015); *OIP Techs.*, 788 F.3d at 1360; *Ultramercial*, 772 F.3d at 711-12; *buySAFE*, 765 F.3d at 1351; *Digitech Image Techs, LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1347 (Fed. Cir. 2014); *Content Extraction & Transmission, LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1345 (Fed. Cir. 2014); *Intellectual Ventures I, LLC v. Capital One Bank (U.S.A.), Nat'l Ass'n*, 792 F.3d 1363, 1365 (Fed. Cir. 2015); *Versata Dev.*, 793 F.3d at 1330-36.

## IV. SNOWCAST'S CLAIMS AGAINST ENDURANCE MUST BE DISMISSED

### A. The Asserted Patents Are Invalid For Claiming Patent Ineligible Subject Matter Under The Two-Step *Alice* Test

As in *Alice*, the claims of the asserted patents are directed to a "fundamental economic practice" and are drafted as merely a "generic computer" implementation of that practice. *Alice*, 134 S. Ct. at 2356-60. An application of the *Alice* two-step framework reveals that the claims at issue merely encompass an abstract idea, and nothing additional in the claims provides an inventive concept that could render them patentable.

#### 1. The Asserted Patent Claims Fail Step 1 Of The *Alice* Test Because They Are Directed To An Abstract Idea

##### (a) The Asserted Patents Claim The Abstract Idea Of Pricing Weather Derivatives

The patents fail the first step of the *Alice* test because the claims are directed to the abstract idea of pricing weather derivatives. *See* '427 Patent, Abstract ("This disclosure relates to a system . . . based on the purchase of weather derivatives to select, manage, minimize, and redistribute financial burdens associated with costs incurred from . . . weather-based events."). The specification repeatedly describes the invention generically as "a system for managing financial risk associated with weather-based service contracts." *Id.*; *accord id.* col. 1 ll. 5-9; *id.* col. 4 ll. 33-39. Most importantly, the independent claims broadly recite performing "risk management and cost containment of weather-related services." *Id.* col. 12 ll. 6-7. Such hedging is """a fundamental economic practice long prevalent in our system of commerce""" and, therefore, "an 'abstract idea' beyond the scope of § 101." *Alice*, 134 S. Ct. at 2356 (citation omitted); *buySAFE*, 765 F.3d at 1353-54 (holding that claims to "long-familiar commercial transactions," such as "creating a contractual relationship," are abstract even if narrowed).

While the independent claims do recite some technical language—such as "a memory of a computer," " a computer network," and "database[s]," '427 Patent col. 12 ll. 9-28 (claim 1)—"adding a 'degree of particularity' does not affect the first step of the [*Alice*] inquiry." *Mkt. Track,* 2015 WL 3637740, at *5 (quoting *Ultramercial*, 772 F.3d at 715). Rather, as this Court has recognized, the first step of the *Alice* inquiry is satisfied where, "[s]tripped of the technical jargon that broadly describe non-inventive elements (*e.g.*, the 'interfaces' and 'processing systems'), and further shorn of the typically obtuse syntax of patents, the patents . . . really only cover an abstract concept." *Smart Sys.*, 2015 WL 4184486, at *4. Indeed, "whatever bells and whistles may be added, when reduced to their core, 'claims directed to the performance of certain financial transactions' . . . must be categorized 'as involving abstract ideas.'" *Id.* (citation omitted). Here, setting jargon aside, the independent claims merely recite the abstract concept of "calculating" the price of weather derivatives. '427 Patent col. 12 ll. 9-21 (claim 1).

As further evidence of abstraction, the patents openly acknowledge that, long before the claimed inventions, "[t]he use of weather derivatives [was] known" and "weather derivatives c[ould] be purchased by traders." '427 Patent at col. 4 ll. 19-22. As the specification explains, the calculations underlying these weather derivative products are well understood in the industry and are admittedly prior art. *See id.* col. 3 ll. 23-49 (discussing prior art methods for hedging using weather derivatives with strike and tick prices). The patents even reference prior art disclosing "*modules* to create customized weather derivatives," as recited in the independent claims. *Id.* col. 4 ll. 19-21 (emphasis added).

**(b)    Courts' Treatment Of Analogous Patents Confirms That The Claims Are Abstract**

The abstract idea of pricing weather derivatives "is not meaningfully different from the ideas found to be abstract in other cases before the Supreme Court and [the Federal Circuit]

involving methods of organizing human activity." *Intellectual Ventures*, 792 F.3d at 1367.[4] The concept of pricing weather derivatives for risk management is strikingly similar to the concept of risk hedging found to be unpatentable by the Supreme Court in *Bilski v. Kappos*, 561 U.S. 593 (2010). The patent application in *Bilski* claimed a method by which "buyers and sellers of commodities in the energy market can protect, or hedge, against the risk of price changes." *Id.* at 599. The Supreme Court held that "[c]laim 1 describe[d] a series of steps instructing how to hedge risk," and "[c]laim 4 put[] the concept articulated in claim 1 into a simple mathematical formula'" *id.* at 599, that included an "estimated location-specific weather indicator." U.S. Patent Application 08/833,892, at 10-11 (filed Apr. 10, 1997) (claim 4) (Exhibit A). Additional claims of the application further specified the use of weather-related risk hedging. *See, e.g.*, *id.* at 10 (claim 3) ("The method of claim 2 wherein said consumption risk is a weather-related price risk."); *id.* at 11 (claim 6) ("The method of claim 4 wherein said energy provider seeks a swap receipt to cover the marginal weather-driven cost."); *id.* at 11-12 (claim 7) (including inputs for "a predetermined plurality of years of weather patterns and establishing the payoffs from each transaction under each historical weather pattern").

The Supreme Court understood such claims as an attempt "to patent both the concept of hedging risk and the application of that concept to energy markets." *Bilski*, 561 U.S. at 609. The Court instructed that "'[h]edging is a fundamental economic practice long prevalent in our system of commerce and taught in any introductory finance class.'" *Id.* at 611 (quoting *In re Bilski*, 545

---

[4] *See, e.g.*, *Alice*, 134 S. Ct. at 2357 (intermediated settlement); *Bilski*, 561 U.S. at 611-12 (risk hedging); *Ultramercial*, 772 F.3d at 715 (using advertising as an exchange); *Content Extraction*, 776 F.3d at 1347 (data collection); *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1346 (Fed. Cir. 2013) (generating tasks in an insurance organization); *OIP Techs.*, 788 F.3d at 1362 (automatic pricing); *Versata Dev.*, 793 F.3d at 1311 (also automatic pricing); *Intellectual Ventures*, 792 F.3d at 1367-68 (budgeting).

F.3d 943, 1013 (Fed. Cir. 2008) (Rader, J., dissenting), *aff'd sub nom. Bilski v. Kappos*, 561 U.S. 593 (2010)).  As such, it found that "[t]he concept of hedging, described in claim 1 and reduced to a mathematical formula in claim 4, is an unpatentable abstract idea."  *Id.*  Applying the same analysis here, the analogous concept of pricing weather derivatives must also constitute an abstract idea.[5]

Moreover, this Court has found comparable claims to be directed to abstract concepts in multiple recent opinions.  *See, e.g.*, *Mkt. Track*, 2015 WL 3637740; *Smart Sys.*, 2015 WL 4184486.  For instance, in *Market Track*, this Court invalidated under 35 U.S.C. § 101 a patent directed to "processing a query and returning results, deriving content from those results, and then organizing and delivering that content somewhere."  *Mkt. Track*, 2015 WL 3637740, at *5.  While the claims "add[ed] certain limitations, such as requiring that the query be processed against a database," the Court found these irrelevant to the Step 1 inquiry.  *Id.*  Thus, because "[a]t its core [the] claim recite[d] the process of identification, organization, and presentation of stored information," the Court found the claims to be abstract.  *Id.*  Like the patent at issue in *Market Track*, the claims here recite identifying and organizing information (cost and weather data) and presenting a result (calculated pricing information).  As in *Market Track*, the presence of superficial technical limitations such as "database[s]," *see id.*, does not change the fact that the core concept of data processing—even if performed to hedge against weather risks—is abstract.

---

[5] To the extent SnowCast argues that its patents are saved from abstraction because they are limited to the field of weather, this argument has been soundly rejected by the Supreme Court and the Federal Circuit.  "An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment, such as the internet."  *Intellectual Ventures*, 792 F.3d at 1366; *see also Bilski*, 561 U.S. at 612 ("[L]imiting an abstract idea to one field of use . . . d[oes] not make the concept patentable."); *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015) ("[T]hat the claims do not preempt all price optimization or may be limited to price optimization in the e-commerce setting do not make them any less abstract.").

The only recent opinion of this Court declining to find a software-only patent abstract under Step 1—*Trading Techs. Int'l, Inc. v. CQG Inc*., 2015 WL 774655 (N.D. Ill Feb. 24, 2015)—is distinguishable from the asserted patents.[6]  Unlike the claims here, the *Trading Techs*. patent "claims [were] directed to solving a problem that existed with prior art [graphical user interfaces]," i.e., a technical problem, which the Court distinguished from "a challenge in business."  *Id*. at *4.  Thus, those patents "went beyond [an] abstract idea because they allowed for qualitatively different and previously unavailable types of trades to occur, as opposed to merely speeding up the process by manipulating data."  *Smart Sys*., 2015 WL 4184486, at *5. This Court has explicitly distinguished the *Trading Techs*. patents from "'claims directed to the mere formation and manipulation of economic relations'[, which] are invalid attempts to claim abstract ideas."  *Id*. at *4 (quoting *Content Extraction*, 776 F.3d at 1347).

2. **The Asserted Patent Claims Fail Step 2 Of The *Alice* Test Because They Do Not Recite An Inventive Concept**

(a) **The Claims Do Not Recite An Inventive Concept**

The patents additionally fail Step 2 of the *Alice* test because the claims merely direct the user to implement the abstract idea of pricing weather derivatives on a computer.  *See* '427 Patent col. 12 ll. 6-39 (claims 1-4); '242 Patent col. 12 1.2 to col. 13 1.31 (claims 1-16); *Alice*, 134 S. Ct.

---

[6] This Court additionally found that the patents at issue in *Chamberlain Grp., Inc. v. Linear LLC*, No. 14-cv-05197, 2015 WL 4111456 (N.D. Ill. July 7, 2015) survived Step 1 of the *Alice* test.  However, the patents at issue in Chamberlain were physical in nature: they were directed to systems for remotely controlling a "moveable barrier" (e.g., a garage door) over a computer network, *id*., at *1-2, and contained numerous physical components, including "a garage door, guide rails, a ceiling, a wall, a power drive unit, an integrated drive rail, an operator arm, a trolley, a push button control unit, electrical conductors, network interface, a remote control transmitter, and an auxiliary power drive."  *Id*., at *8.  Thus, unlike the software modules of the patents asserted here, "the claim [was] directed to real-work, physical opening and closing of a door," and the Court thus held that it was not directed to an abstract concept.  *Id*.

at 2355 (holding that claims fail Step 2 where they do not contain limitations that "'transform the nature of the claim' into a patent-eligible application") (quoting *Mayo*, 132 S. Ct. at 1297 (2012)) As the Supreme Court in *Alice* succinctly explained, "transformation into a patent-eligible application requires 'more than simply stat[ing] the [abstract idea] while adding the words "apply it."'" *Alice*, 134 S. Ct. at 2357 (alterations in original) (quoting *Mayo*, 132 S. Ct. at 1294). The patents at issue here provide nothing more. Rather, the claims merely enumerate the abstract steps required to price weather derivatives. For instance, claim 1 of the '242 Patent recites (1) "*entering* . . . input information from the weather database and the weather option database"; (2) "*calculating* . . . the cost at the site in the area," "*calculating* the base price for services," and "*calculating* the tick price and the associated premium"; and "(3) "*connecting* a weather risk management system" including "module[s]" for performing each of the foregoing calculations.[7] '242 Patent col. 12 ll. 5-28 (claim 1) (emphasis added).

Because the step of entering data is a "well-understood, routine, conventional activit[y] previously known to the industry," it does not constitute an inventive step. *Versata Dev.*, 793 F.3d at 1334; *see also Alice*, 134 S. Ct. at 2359; *Mayo*, 132 S. Ct. at 1294. The specification admits that insurance providers have long provided "paper-based estimates" by "predict[ing] the cost of monthly installments, or even the cost per unit of yearly estimates taken from a weather database." '427 Patent col. 7 ll. 32-44. The patent further explains that even in the claimed computer-implemented system, such data entry can be performed manually "via a keyboard, a mouse, or other user interface." *Id.* col. 7 ll. 13-23; *see also id.* col. 7 ll. 53-54 ("[I]nformation

---

[7] Claim 1 of the '427 Patent contains substantively equivalent (1) collecting and (3) connecting steps, but does not include the (2) calculating steps. *See* '427 Patent col. 12 ll.6-28. Thus, to the extent the '242 Patent fails to claim an inventive concept, the '427 Patent—which has even fewer limitations—must also fail.

is entered, often manually by an operator . . . ").  Such manual data entry has been well

understood, conventional, and routine for decades; it cannot render the claims patentable.

Further, the calculation steps "at issue here are unpatentable because they 'could still be

made using a pencil and paper.'"  *Intellectual Ventures*, 792 F.3d at 1368 (quoting *CyberSource

Corp. v. Retail Decisions Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011)); *Versata Dev.*, 793 F.3d at

1331-36 (Step 2 of the *Alice* analysis was not satisfied where "the underlying process 'could also

be performed via pen and paper'" (citation omitted)); *cf. Card Verification Solutions, LLC v.

Citigroup, Inc.*, No. 13 C 6339, 2014 WL 4922524, at *4 (N.D. Ill. Sep. 29, 2014) (preliminarily

ruling that a patent satisfied Step 2 of the *Alice* analysis only because "pseudorandom tag

generating . . . could not be done with pen and paper").  Indeed, the specification demonstrates

that the calculations require only basic arithmetic.  *See* '427 Patent col. 8 11. 21-23 ("[P]rice per

snow removal . . . is then multiplied by the expected yearly estimates."), *id.* col. 10 11. 10:21-22

("[B]ase price BP is taken and is added to the premium . . . .").  Moreover, the patents admit that

certain of these calculations were performed on paper in the past, and demonstrate that the

remaining calculations may be performed manually by providing written examples:

| Claimed Calculation | Disclosure of Manual Calculation in Patent Specification |
|---|---|
| "calculating [by the unitary event module from the entered input information] a *cost at a site* in an area"  '427 Patent col. 12 11. 11-13 (claim 1) (emphasis added). | "The modules include a unitary event module **30** for calculating at least a *cost 35 as shown in FIG. 4 at a site* in an area. . . . Former per event proposals, often *paper-based* estimates given by service providers to clients and users of the services, are documents summarizing the different elements of coverage between the parties . . . The proposals allowed a service provider, not unlike the unitary event module, to calculate and predict the costs of the service **35** at a site for an average year."  Patent col. 7 11. 28-42 (emphasis added). |
| "calculating [the] *base price* for services at a plurality of sites from the unitary event module"  *Id.* col. 12 11. 13-15 (claim 1) (emphasis added). | "If the unitary event module had calculated a per event price of $25,000 for each of these four sites the *BP* of $102,500 may be calculated with the above equation [*BP* = $25,000 × 1.1 + $25,000 × 1.1 + $25,000 × 1.1 + $25,000 × 0.8]."  *Id.* col. 9 11. 29-33 (brackets in original; emphasis added). |

| "calculating [the] *tick price* and [the] associated premium for the selection of an option for managing the risk and containing the cost" by the hedge assignment module *Id.* col. 12 ll. 15-18 (claim 1) (emphasis added). | "For example, if the out of pocket expenses are $100,000 (corresponding to the price to perform the clean up operation and the service of cleaning a total of 38 inches of snow of $90,000, paying the premium associated with the option of $7,000, and ultimately paying a commission of $3,000), then the *tick price* may be approximately $2,700 ($100,000/38) where the ultimate coverage desired is another 38 inches in one example." *Id.* col. 10 ll. 22-3 (emphasis added). |
|---|---|

Likewise, connecting a computer to perform the foregoing actions is not an inventive step, because "[i]nstructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." *Intellectual Ventures*, 792 F.3d at 1368; *see Alice*, 134 S. Ct. at 2359 (finding "use of a computer to create electronic records, track multiple transactions, and issue simultaneous instructions" not an inventive concept). Although the claims employ some technical terminology—such as "computer network," "database[s]," '427 Patent col. 12 ll. 11, 19-21, 24-26 (claim 1)—"reliance on the empty language of terminals, interfaces, processors, and memory cannot save the patents." *Smart Sys.*, 2015 WL 4184486, at *5; *see also Intellectual Ventures*, 792 F.3d at 1368 ("The recited elements, e.g., a *database* . . . and a *communication medium*, are all generic computer elements . . . [which do] not make an abstract idea patent-eligible." (emphasis added)); *Mkt. Track,* 2015 WL 3637740, at *7 ("processing queries for databases . . . is a routine, conventional use of such databases" and is insufficient to render an abstract idea patentable). Moreover, while at first blush it may appear that the claimed "modules" reference specific structures, the specification clarifies that they are actually formless software capable of "operat[ing] within . . . a personal computer, a personal digital equipment, or a cell phone." '427 Patent col. 7 ll. 24-28. The modules "may [even] be implemented via spreadsheet software." *Id.* col. 11 ll. 9-10. Thus, the modules refer merely to any software capable of performing the abstract pricing calculations, and cannot amount to an inventive concept.

The specification even acknowledges that the patents are merely directed to automating these "complex and difficult" transactions so that they are available to "users of services in the weather industry" who may find the transactions "too complex." *Id.* col. 4 11. 22-25. But, while use of a computer may make it simpler or faster to apply an abstract idea, "relying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible" *OIP Techs.*, 788 F.3d at 1363; *see also Intellectual Ventures*, 792 F.3d at 1367 ("Nor, in addressing the second step of *Alice*, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept."). "[T]he fact that the required calculations could be performed more efficiently via a computer does not materially alter the patent eligibility of the claimed subject matter." *Bancorp Servs., LLC v. Sun Life Assurance Co. of Can.*, 687 F.3d 1266, 1278 (Fed. Cir. 2012); *OIP Techs.*, 788 F.3d at 1363 (finding unpatentable claims directed to "the automation of the fundamental economic concept of offer-based price optimization through the use of generic-computer functions").

### (b)    Courts' Treatment of Analogous Patents Confirms That The Patents Do Not Claim An Inventive Concept

As with Step 1, analogous patents have failed the second step of the *Alice* analysis in several recent cases. For instance, in *Bilski*, the Supreme Court held that the "concept of hedging risk and the application of that concept to energy markets" were directed to unpatentable subject matter. *Bilski*, 561 U.S. at 609. Although *Bilski* was decided before the Supreme Court adopted the two-step test, the Federal Circuit confirmed this year that *Bilski* stands for the proposition that "the generally known idea of hedging commodities is not rescued from 'abstraction' through the use of computer technology." *Internet Patents*, 790 F.3d at 1345. Like *Bilski*, the asserted patents merely claim the concept of hedging—in this case within the field of weather rather than commodities—using generic computer hardware, and thus fail under Step 2 of the *Alice* analysis.

16

Similarly, in *Market Track*, this Court held that the analogous concept of "processing a query and returning results, deriving content from those results, and then organizing and delivering that content somewhere," *Mkt. Track*, 2015 WL 3637740, at *5, was unpatentable because "processing queries for databases relating to images is a routine, conventional use of such databases." *Id.* at *7. This was particularly true because the patentee "repeatedly disavow[ed] any technical limitations," instead claiming an amorphous system that "'c[ould] be accomplished . . . in a multitude of ways'" and "depend[ed] on no particular system or software for its implementation." *Id.* (ellipsis in original). Likewise here, the asserted claims recite identifying and organizing information (cost and weather data) and presenting a result (calculated pricing information). *E.g.*, '427 Patent col. 12 11. 6-28 (claim 1). The recited generic computing hardware performs only routine, conventional tasks, such as querying "database[s]," "connecting . . . to a computer network," and "calculating" mathematical formulas. *Id.* Moreover, the patentee explicitly disavowed any technical limitations (*see id.* col. 11 1. 40 to col. 12 1. 1 ("[T]here is no intent to limit the invention to [disclosed] embodiments . . . .")); explained that the invention could be practiced in a multitude of ways (*id.* col. 12 11. 2-3 ("[T]he intention . . . is to cover all modifications and embodiments . . . .")); and refused to limit the invention to any particular system or software. *See id.* col. 7, 11. 24-28, col. 11, 11. 9-10 (the patent can "operate[e] . . . within a personal computer, a personal digital equipment, or a cell phone" and "may also be implemented via spreadsheet software"). Thus, under this Court's logic in *Market Track*, the asserted patents fail Step 2 of the *Alice* inquiry because "automating an existing process through the application of routine, generic, computer systems and components . . . is simply not patent-eligible." *Mkt. Track*, 2015 WL 3637740, at *8.

Instead, in order to satisfy Step 2, the asserted patent claims would need to include an additional inventive concept, like that in the claims of the patent at issue in *DDR Holdings, LLC v Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014). In that case, the Federal Circuit found a computer-implemented method patent eligible because the claims recited "a solution that was necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks." *Versata Dev.*, 793 F.3d at 1333 (citing *DDR Holdings*, 773 F.3d at 1259); *see also Smart Sys.*, 2015 WL 4184486, at *5 (noting in dicta that a claim may be patent eligible if "a computer [is] necessary to the performance of the method, in a specific (not just faster) way that no human could perform"). Specifically, the patent in *DDR Holdings* was directed to an "automatically-generated hybrid web page that combines visual 'look and feel' elements from [a] host website and product information from [a] third-party merchant's website related to [a] clicked advertisement." 773 F.3d at 1257. This system was patentable because it was directed to the uniquely technological problem of "retaining website visitors that, if adhering to the routine, conventional functioning of Internet hyperlink protocol, would be instantly transported away from a host's website after 'clicking' on an advertisement." *Id.* By contrast, the patents at issue here readily admit "[t]he use of weather derivatives [was] known" prior to filing. '427 Patent col. 4 11. 19-25. Thus, unlike the technological solutions in *DDR Holdings*, the asserted patents recite "patent-ineligible claims . . . that . . . merely recite[] commonplace business methods aimed at processing business information, applying known business processes to particular technological environments." *Versata Dev.*, 793 F.3d at 1333.

### 3. The Machine-Or-Transformation Test Confirms That The Asserted Patents Are Unpatentable

"'Although an analysis of § 101 patentable subject matter must follow the [*Alice*] two-step framework, the machine-or-transformation test is still 'a useful and important clue, an

investigative tool, for determining whether some claimed inventions are [patentable] under §

101.'" *Mkt. Track*, 2015 WL 3637740, at *9 (quoting *Bilski*, 561 U.S. at 604). "The machine-or-

transformation test is a two-branched inquiry; an applicant may show that a process claim

satisfies § 101 either by showing that his claim is tied to a particular machine, or by showing that

his claim transforms an article." *In re Bilski*, 545 F.3d at 961. The patents here fail both prongs.

First, not one of the challenged claims is tied to a specific machine. Rather, the patents

take pains to clarify that "although the teachings of this disclosure have been illustrated in

connection with certain embodiments and methods, there is no intent to limit the invention to

such embodiments and methods." '427 Patent col. 11 1. 38 to col. 12 1. 2; *see also id.* col. 5 11.

41-46. The purported invention can use "any interface, structure, or system and method," *id.* col.

6 11. 51-56; and "may be implemented using firmware and/or hardware devices such as

application-specific integrated circuits (ASICs), programmable logic arrays, state machines,

etc.," *id.* col. 6 11. 17-20, or even "spreadsheet software." *Id.* col. 11 11. 9-10; *see also id.* col. 6

11. 51-55 (the "'platform' is to be understood generally as any interface, structure, or system and

method thereof that is capable of performing the function of allowing a user to launch and

operate a weather risk management system"). At best, the claims are tied to a general purpose

computer, which fails to qualify as a "particular machine." *Dealertrack, Inc. v. Huber*, 674 F.3d

1315, 1333-34 (Fed. Cir. 2012). Indeed, in *Market Track*, this Court found that comparable

statements (e.g., "'system 100 is merely one example'"; "'the present invention can be

implemented in software, firmware, hardware, or some combination thereof'") "expressly

disavow[ed] any requirement for specific programming or architecture." *Mkt. Track*, 2015 WL

3637740, at *9 (citations omitted). Under the same logic, the asserted patents have expressly

disavowed any particular machine, and fail the first prong of the machine-or-transformation test.

Second, none of the challenged claims transforms any article into a different state or thing. "The transformation prong looks to whether the claimed invention effects a physical transformation of 'physical objects or substances,' or at the very least things that are 'representative of physical objects or substances.'" *Mkt. Track*, 2015 WL 3637740, at *11 (quoting *Ultramercial*, 772 F.3d at 717). "[M]anipulation of digital data, such as performing a relational query on a computer database or cropping, resizing, or arranging digital images and associated information into different formats, does not satisfy the transformation prong of the machine-or-transformation test." *Id.* at *11; *see In re Bilski*, 545 F.3d at 963 ("Purported transformations or manipulations simply of public or private legal obligations or relationships, business risks, or other such abstractions cannot meet the test because they are not physical objects or substances, and they are not representative of physical objects or substances."). As in *Market Track*, the asserted patents at most disclose manipulating data to "calculate[e]" various quantities. '427 Patent col. 12 11. 9-28 (claim 1). They do not transform a physical article, and therefore fail the second prong of the machine-or-transformation test.

### 4. The Dependent Claims Of The Asserted Patents Are Equally Unpatentable

"[T]he dependent claims in the [asserted patents] are invalid 'because all the claims are substantially similar and linked to the same abstract idea.'" *Mkt. Track*, 2015 WL 3637740, at *14 (citing *Content Extraction*, 776 F.3d at 1348) (holding all claims depending from an abstract claim unpatentable). Claim 2 of the '427 Patent, and claims 2, 5, 8, and 14 of the '242 Patent merely recite entering additional data to use in calculations. However, "insignificant 'data-gathering steps'" that "add nothing of practical significance to the underlying abstract idea" cannot make an otherwise abstract concept patentable. *Ultramercial*, 772 F.3d at 716 (quoting *CyberSource*, 654 F.3d at 1370). For instance, claim 2 of the '427 Patent merely adds the limitation "entering at the *interface* a correction factor." '427 Patent col. 12 11. 29-32. But, this

Court has explained that " reliance on the empty language of . . . *interfaces* . . . cannot save the patents." *Smart Sys.*, 2015 WL 4184486, at *5 (emphasis added).[8]

Claims 3 and 4 of the '427 Patent and claims 3, 4, 6, 7, 9, 10, 15, and 16 of the '242 Patent merely provide further detail regarding the data inputs and mathematical formulae used to calculate various quantities. For instance, claim 3 of the '427 Patent merely specifies that "the hedge assignment module calculates the tick price *from a ultimate coverage desired* that is associated with a yearly precipitation of twice the normal precipitation." '427 Patent col. 12 11. 34-36 (emphasis added). This limitation is neither technical nor inventive; it merely specifies the value of one variable employed by the mathematical formula. *See Bilski*, 561 U.S. at 612 (finding that the addition of "techniques to help establish some of the inputs into the equation" did not render abstract idea of hedging risk in the energy market patentable). Thus, because the independent claims are unpatentable, these dependent claims are also unpatentable.

Claims 11 and 12 of the '242 Patent merely recite providing a "report" of calculated values. '242 Patent col. 13 11. 8-14. The specification of the '242 Patent clarifies that the report can take the form of "an electronic document" or "an HTML page on the web." '242 Patent col. 11 11. 6-10. However, "the process of identification, organization, and presentation of stored information in a useful form . . . is an 'abstract idea, devoid of a concrete or tangible application.'" *Mkt. Track*, 2015 WL 3637740, at *5 (quoting *Ultramercial*, 772 F.3d at 715).

---

[8] Claim 14 of the '242 Patent specifies that the user manually retrieves the data from "database[s]." '242 Patent col. 13 11. 18-22. However, this Court held in *Market Track* that "requiring that [a] query be processed against a database" is insufficient to render an abstract concept patentable. *Mkt. Track,* 2015 WL 3637740, at *5; *see Ultramercial*, 772 F.3d at 717 ("[T]he transfer of content between computers is merely what computers do and does not change the [patent eligibility] analysis.").

Finally, claim 13 of the '242 Patent merely recites "implement[ing] via a spreadsheet software" on the "Internet." '242 Patent col. 13 11. 15-17.  However, performing an abstract idea "using prepackaged software is not the least bit inventive." *Mkt. Track,* 2015 WL 3637740, at *8.

### B.    Deceptive Trade Practices

For Endurance's state law claim to survive a motion to dismiss, the Court must find that the Complaint states "'a claim to relief that is plausible on its face.'" *Am. Kitchen Delights, Inc. v. John Soules Foods, Inc*., No. 14 CV 646, 2014 WL 4897506, at *1 (N.D. Ill. Sept. 29, 2014) (J. M. Shah) (quoting *Yeftich v. Navistar, Inc*., 722 F.3d 911, 915 (7th Cir. 2013) (citations omitted)), *case reopened*, 2015 WL 333073 (N.D. Ill. Jan. 23, 2015).  "'A Claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct.'" *Id.*  (citations omitted).

Here, SnowCast's UDTPA claim is facially insufficient, as SnowCast alleges Endurance violated Sections 2(a)(5) and 2(a)(12) of the UDTPA, 815 Ill. Comp. Stat. Ann. 510/2(a)(5), (12) (West 2008), merely by selling products that are now the subject of a patent infringement allegation.  D.I. 1 ¶¶ 35, 36.  This allegation, without more, does not state a claim for a violation of the UDTPA that is "plausible on its face." *Am. Kitchen Delights*, 2014 WL 4897506, at *5 n. 7 ("'[s]o long as the statements at issue do not disparage the quality of the plaintiff's goods or services, no cause of action will lie under the [IUDTPA].'") (citations omitted, alteration in original); *Fedders Corp. v. Elite Classics*, 268 F. Supp. 2d 1051, 1064 (N.D. Ill. 2003) ("The [UDTPA] only applies to statements that are false.") (quoting *Richard Wolf Medical Instruments Corp. v. Dory*, 723 F.Supp. 37, 40 (N.D. Ill. 1989)).  The UDTPA is not a formless statute that can be used to bolster any and all claims related to business; instead, it lays out specific requirements, none of which are met here.

1.     **Endurance Has Not Represented Sponsorship Or Affiliation With**
       **SnowCast Under UDTPA Section 2(a)(5)**

Under Section 2(a)(5) of the UDTPA, a person engages in deceptive trade practices when

he "represents that goods or services have sponsorship, approval, characteristics . . . or quantities

that they do not have or that a person has a sponsorship, approval, status, affiliation, or

connection that he or she does not have."  815 Ill. Comp. Stat. Ann. 510/2(a)(5) (West 2008).

SnowCast also has not alleged that Endurance either represented that its products practice

SnowCast technology or made any other misrepresentations about its products.  SnowCast also

has not alleged that Endurance represented it had an affiliation with or license from SnowCast.

Instead, SnowCast made a general allegation that "[t]hose in the industry who know of SnowCast

and its patented methods . . . may be misled into thinking that Defendant's contracts are produced

under a valid license or do not infringe SnowCast's technology."  D.I. 1 ¶ 35.  Even if such an

allegation could satisfy the requirements of Section 2(a)(5), which it cannot, SnowCast has not

identified any customer or potential customer of Endurance that may have been misled.

Regardless, SnowCast's allegation must fail because SnowCast has not alleged any facts

that plausibly suggest that Endurance made any improper representations.  Without an alleged

misrepresentation by Endurance about SnowCast or its products, there can be no violation of

Section 2(a)(5) of the UDTPA and SnowCast's claim must be dismissed.  *See Connell v. KLN*

*Steel Prods. Ltd.*, No 04 C 194, 2009 WL 691292, at *16 (N.D. Ill. Mar. 16, 2009) (J. V. Kendall)

(finding plaintiffs alleging patent infringement failed to support a separate claim for violation of

UDTPA because "Plaintiffs have failed to provide any facts that could establish that Defendants

took actions that could create a likelihood of confusion or misunderstanding among consumers"),

*dismissed by* 449 F. App'x 14 (Fed. Cir. 2010); *c.f. Russian Media Group, LLC v. Cable Am. Inc.*,

No. 06 C 3578, 2008 WL 360692, at *1, *4 (N.D. Ill. Feb. 7, 2005) (finding a proper claim for

misrepresentation as to "approval … affiliation, or connection" where defendant allegedly purchased and resold DIRECTV and DishNetwork programming without authorization).

2.    **Endurance's Acts Have Not Created A Likelihood Of Confusion Or Misunderstanding Under UDTPA Section 2(a)(12)**

Under Section 2(a)(12) of the UDTPA, a person engages in deceptive trade practices when he "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 Ill. Comp. Stat. Ann. 510/2(a)(12) (West 2008) "The [likelihood-of-confusion] [ ] standard requires only that a seller identify his product or service in such a manner that 'purchasers exercising ordinary care to discover whose products [or services] they are buying will know the truth and not become mistaken.'" *Phillips v. Cox*, 261 Ill. App. 3d 78, 83 (1994).

SnowCast has not alleged that Endurance engaged in any relevant conduct other than simply selling its products. Instead, SnowCast has merely asserted that "[t]hose in the industry who know of SnowCast and its patented methods … *may be* misled into thinking [Endurance's] contracts are produced under a valid license or do not infringe." D.I. 1 ¶ 35 (emphasis added). This is insufficient to state a claim for a violation of Section 2(a)(12) because SnowCast has not alleged that Endurance took any actions that "unreasonably interfere with [SnowCast's] conduct of [its] business," which is the primary purpose of the UDTPA. *Phillips*, 261 Ill. App. 3d at 81, quoting *Popp v. Cash Station, Inc*., 244 Ill.App.3d 87, 98 (1992).

This case is distinguishable from those in which parties successfully plead and assert violations of Section 2(a)(12). For example, the owner of three Chicago's Pizza restaurants successfully demonstrated that the owner of another restaurant called Chicago's Pizza violated UDTPA, including subsection (12), where the defendant: used a similar name and logo; advertised multiple locations when he only had one location; and where defendant's phony locations corresponded to plaintiff's locations. *Chicago's Pizza, Inc. v. Chicago's Pizza*

24

*Franchise Ltd. USA*, 384 Ill. App. 3d 849, 866-67 (2008). Similarly, in *Phillips*, plaintiff sufficiently stated a claim for a violation of the UDTPA where plaintiff alleged defendant opened a sign-making store named David Cox d/b/a Sign Design and Construction next door to plaintiff's sign-making store named David Cox Signs. *Phillips*, 261 Ill. App. 3d at 83. In both of those cases, Plaintiff made allegations that a party did something that was likely to mislead consumers. In the instant case, SnowCast can point to no actions taken by Endurance that could create a "likelihood of confusion," 815 Ill. Comp. Stat. Ann. 510/2(a)(12) (West 2008)—no claims of similarity between Endurance and SnowCast products, no suggestions of a relationship between Endurance and SnowCast, not even a mention of SnowCast in any context. SnowCast's threadbare allegation as to what customers "may be misled into thinking" (D.I. 1 ¶ 35) is insufficient to state a claim under Section 2(a)(12).

### 3. Injunctive Relief Is The Only Remedy Available Under The UDTPA

The remedy for a violation of UDTPA is injunctive relief, not damages. *Chicago's Pizza*, 384 Ill. App. 3d at 866. Given this, allowing plaintiff to premise a UDTPA violation on the mere act of selling a product that later becomes subject to a claim for patent infringement would lead to an absurd result. Specifically, if SnowCast is allowed to proceed on its UDTPA claim and successfully procures an injunction under the UDTPA, the Court could end up issuing an injunction that prohibits Endurance from selling the products at issue regardless of whether those products are found to infringe SnowCast's patents. If accepted, SnowCast's interpretation of the UDTPA could lead to a result that would have a chilling effect on commerce.

## V. CONCLUSION

For the forgoing reasons, Endurance respectfully requests that the Court grant its motion to dismiss all of SnowCast's claims against Endurance.

Dated:  September 24, 2015

Respectfully submitted,

  /s/ Daniel A. DeVito

Daniel A. DeVito
Rachel R. Blitzer
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, NY  10036-6522
(212) 735-3000

Mairead J. Schwab
SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
155 N. Wacker Drive
Chicago, Illinois 60606
(312) 407-0700

*Attorneys for Defendant Endurance
Specialty Holdings Ltd.*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 24th day of September, 2015, I electronically filed the BRIEF IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT ENDURANCE SPECIALTY HOLDINGS LTD. with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

I declare under penalty of perjury that the foregoing statements are true and correct.



Daniel A. DeVito